Elizabeth V. BOGOSIAN, Plaintiff,

v.

James H. WOLOOHOJIAN, Estate of Harry Woloohojian and Woloohojian Realty Corporation, Defendant.

Woloohojian Realty Corporation, Plaintiff,

v.

Elizabeth V. Bogosian, Wistow & Barylick, Inc., Tillinghast, Licht & Semonoff, Ltd., Medeiros, Karmen & Sanford, Inc., R. Daniel Prentiss and Associates, P.C., The United States of America (Internal Revenue Service), Indeglia & McGovern, Brendan Smith, Esq., and Rhode Island Hospital Trust National Bank, Defendants.

Nos. C.A. 88–373–L, 93–0348–L.

United States District Court,
D. Rhode Island.

April 13, 2000.

Eustace T. Pliakas, Tillinghast Licht Perkins Smith & Cohen LLP, Providence, RI, Richard A. Boren, David M. Campbell, Stephen M. Brusini, Visconti & Boren Ltd., Providence, RI, Matthew F. Medeiros, Medeiros Karmen & Sanford Inc., Providence, RI, William Y. Chaika, Michael J. Lepizzera, Law Offices of William C. Dimitri, Providence, RI, John W. Cannavino, Cummings & Lockwood, Stamford, CT, William H. Bright, Jr., Cumings & Lockwood, Hartford, Ct, Charles D. Ray, Cummings & Lockwood, Hartford, CT, Brendan P. Smith, Providence, RI, for Elizabeth V. Bogosian.

William Richard Grimm, Hinckley, Allen & Snyder, Providence, RI, for Woloohojian Realty Corp. and James H. Woloohojian

William Richard Grimm, Hinckley, Allen & Snyder, Providence, RI, for James H. Woloohojian, defendant.

Joseph John Reale, Jr., Joseph J. Reale Jr. Ltd., Providence, RI, for Pezzuco Const. Co., Inc.

Mary Ellen McQueeney–Lally, Providence, RI, for Cummings & Lockwood.

Max Wistow, Wistow & Barylick Incorporated, Providence, RI, for Wistow & Barylick, Inc.

Richard A. Licht, Tillinghast Licht Perkins Smith & Cohen LLP, Providence, RI, for Tillinghast, Licht & Semenoff.

Matthew F. Medeiros, Medeiros Karmen & Sanford Inc., Providence, RI, for Medeiros, Karmen and Sanford.

Richard Daniel Prentiss, McGovern, Noel & Benik, Providence, RI, pro se.

Vincent A. Indeglia, Indeglia & Associates, Providence, RI, for Indeglia & McGovern.

Brendan P. Smith, Providence, RI, pro se.

Richard W. MacAdams, MacAdams & Wieck, Inc., Providence, RI, for Rhode Island Hosp. Trust Nat. Bank.

Matthew F. Medeiros, Medeiros Karmen & Sanford Inc., Providence, RI, for Daniel E. Kieliszak, Kieliszak, Eggert & Co. and James R. Eggert.

Robert M. Duffy, Christine K. Ahern, Duffy & Sweeney, Providence, RI, for Windward Capital Corp.

John J. Hogan, Harrington & Hogan, Providence, RI, for Tillinghast, Licht & Semenoff.

## DECISION AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on remand from the United States Court of Appeals for the First Circuit.[1] Although this case has proliferated extensive litigation involving many issues,[2] the Court's discreet task at this juncture is to determine the amount owed to Elizabeth V. Bogosian ("plaintiff") for her shares in Woloohojian Realty Corporation ("defendant WRC"), which defendant WRC elected to purchase over eleven years ago. Following a bench trial and extensive calculations, this Court determines that plaintiff is entitled to $4,031,273.58 for her shares plus $3,808,801.05 in interest, for a total of $7,840,074.63.

1. See Bogosian v. Woloohojian, 158 F.3d 1 (1st Cir.1998), aff'g in part, rev'g in part Bogosian v. Woloohojian Realty Corp., 973 F.Supp. 98 (D.R.I.1997).

2. See id. See also Bogosian v. Woloohojian, 901 F.Supp. 68 (D.R.I.1995), appeal dismissed, 86 F.3d 1146 (1st Cir.1996); Bogosian v. Woloohojian, 882 F.Supp. 258 (D.R.I.1995);

## I. Background

The background of this case is detailed comprehensively in the First Circuit's decision, see Bogosian, 158 F.3d at 2–6, and Judge Francis Boyle's decision in this matter, see Bogosian, 973 F.Supp. at 100–106; therefore, this Court will limit its discussion to the matters relevant to the task at hand following the remand.

Plaintiff filed suit in this Court on June 23, 1988 because of a dispute with her two brothers, defendants James and Harry Woloohojian (whose estate was substituted as a defendant upon his death in 1989), with whom she owned defendant WRC in equal shares. The action was in this Court because of diversity jurisdiction. On January 19, 1989, plaintiff filed an Amended Complaint which, among other things, included a petition to dissolve defendant WRC under R.I.Gen.Laws § 7–1.1–90. On February 16, 1989, defendant WRC elected to purchase plaintiff's shares pursuant R.I.Gen.Laws § 7–1.1–90.1. Under that statute, plaintiff is entitled to the fair value of her shares as of the date of her election, January 19, 1989 (the "valuation date"), plus interest from the date of defendant WRC's election, February 16, 1989. See R.I.Gen.Laws § 7–1.1–90.1 (1999).

The case was originally assigned to Judge Boyle. On July 13, 1990, he ordered defendant WRC to give plaintiff a $10 million mortgage on a property owned by WRC referred to as the Jamestown Apartments as security for her claim. In addition, as an advance on her ultimate recovery, Judge Boyle ordered defendant WRC to make a payment of $100,000 and then to pay plaintiff $10,000 monthly until the entry of final judgment. Both of these orders were affirmed by the First Circuit. See Bogosian, 923 F.2d at 905. As will be

Flanders + Medeiros, Inc. v. Bogosian, 868 F.Supp. 412 (D.R.I.1994), aff'd in part, rev'd in part, 65 F.3d 198 (1st Cir.1995); Bogosian v. Woloohojian, 831 F.Supp. 47 (D.R.I.1993); Bogosian v. Woloohojian Realty Corp., 923 F.2d 898 (1st Cir.1991); Bogosian v. Woloohojian, 749 F.Supp. 396 (D.R.I.1990).

discussed, these payments have been made over the years.

On July 31, 1990, Judge Boyle appointed a special master to value the property. In August, 1992, the special master presented his initial report, which valued defendant WRC at $13,240,404. Both parties objected, and Judge Boyle sent the report back for adjustments. *See Bogosian*, 831 F.Supp. at 57.

In the meantime, defendant WRC sold a piece of property located at Routes 2 and 117 in Warwick, Rhode Island (the "Rte. 2/117" property). In an effort to pay plaintiff a portion of her eventual recovery early on to reduce interest accruals, defendant WRC issued two checks payable to plaintiff totaling $1 million and delivered them on December 23, 1992 to Flanders & Medeiros ("F & M"), plaintiff's counsel at the time. However, because of a conflict between plaintiff and F & M over the appropriate distribution of the funds, and other reasons, plaintiff refused to endorse the checks. About a month after delivery of the checks, defendant WRC withdrew the money from the account on which the checks were drawn and invested it, but arranged with the bank for overdraft protection should plaintiff attempt to cash the checks. The conflict between plaintiff and her counsel resulted in litigation, *see Bogosian*, 65 F.3d at 199, and the checks were never cashed.

On June 25, 1993, because of questions over monies owed by plaintiff to various creditors, defendant WRC filed an interpleader action in this Court, asking to make payment of any sums due to plaintiff into the Registry of Court. In that action, defendant WRC deposited the same $1 million, along with an additional $95,000, into the Registry of Court in the spring of 1994. When this litigation was assigned to this writer in 1997 (after Judge Boyle took inactive senior status), the interpleader case was consolidated with plaintiff's original dissolution petition.

In September, 1994, the special master produced his final report, valuing the corporation at $14,705,404. Both parties objected. However, in April, 1995, Judge Boyle affirmed the report, subject to the further resolution of two matters: 1) a determination of the rate at which prejudgment interest should be applied and 2) a proposal by defendant WRC, detailing the manner in which the corporation would fund the purchase of plaintiff's shares. *See Bogosian*, 882 F.Supp. at 266. Judge Boyle stated that the latter order was necessary to determine what role, if any, the tax impact of the share purchase would play in the valuation of the corporation. *See id.*

Defendant WRC submitted such a proposal on May 12, 1995 ("Payment Plan"), specifying that the purchase would be funded by: 1) the sale of the Rte. 2/117 property (which had already occurred), 2) the sale or transfer to plaintiff of a property known as the Snow Street Block, 3) the sale or transfer to plaintiff of a property known as the Seabury Apartments, 4) the refinancing of the Jamestown Apartments and 5) the borrowing of any additional funds required.

On July 31, 1997, Judge Boyle issued his final decision detailing the amount owed to plaintiff for her shares. *See Bogosian*, 973 F.Supp. at 112. First, Judge Boyle rejected defendant WRC's argument that the special master's valuation of the corporation should be reduced to reflect the corporation's "deferred tax liabilities," due to capital gains taxes that result from the sale of real estate assets at a value higher than their tax basis. *See id.* at 106. Next, Judge Boyle set the prejudgment interest rate at 11%, compounded monthly. *See id.* at 110. Judge Boyle then rejected defendant WRC's contention that it should be allowed "principal credits" for various payments it had made, including the $1 million delivered to F & M in December, 1992 and the $1,095,000 deposited in the Registry of Court in the spring of 1994. *See id.* at 110–112. A principal credit would have abated interest from accruing on the

amount of the payment from the date on which it was made. Finally, Judge Boyle stated that plaintiff would bear one-third of the valuation costs. *See id.* at 113.

Defendant WRC appealed Judge Boyle's rulings with respect to the disallowance of a discount for deferred tax liabilities, the prejudgment interest rate and the disallowance of the requested interest abatements.

In considering the deferred tax liability issue, the First Circuit reversed Judge Boyle's ruling in part, stating:

> Judge Boyle's decision would be correct if there were no plans to sell any of the properties at any time in the foreseeable future, because none of the liabilities would be incurred unless the properties were sold. However, WRC took the position that its obligation to pay [plaintiff] for her stock compelled it to make property sales.... The valuation of WRC must include the expected tax liability that will be incurred on the three specifically planned sales and transfers [contained in the Payment Plan] and [plaintiff] will effectively shoulder one-third of the reduction. Any other decision would falsely inflate the value of WRC.

*Bogosian,* 158 F.3d at 6–7. The First Circuit further reversed Judge Boyle's award of compound, instead of simple, interest, but allowed the 11% rate to stand. *See id.* at 9. Finally, the Court reversed in part Judge Boyle's disallowance of interest abatements. *See id.* at 9–10. The Court held that defendant WRC was entitled to a principal credit for the $1,095,000 that it deposited in the Registry of Court from the date of deposit. *See id.* at 9. Furthermore, the Court held that defendant WRC was entitled to a principal credit for the $1 million that it tendered to plaintiff in December, 1992, at least until the overdraft protection on the drawing account expired. *See id.* at 10. The Court left it to the discretion of this Court to determine whether further interest abatement on this amount was appropriate. *See id.* The

Court remanded the matter to this Court for a final determination, consistent with its rulings, of the amount owed to plaintiff for her shares. *See id.* at 12.

On March 30, 1999, this Court stopped interest from running when plaintiff requested and this Court granted a continuance in the matter. Subsequently, this Court held a bench trial to consider the remand issues over six days between August 3, 1999 and September 10, 1999. The matter is now in order for decision.

## II. Methodology

Because of the detail-oriented nature of the task at hand, a description of the methodology the Court will follow is appropriate. First, the amount of the deferred tax liability must be determined in accordance with the First Circuit's directive. This figure will then be subtracted from the special master's valuation of defendant WRC to reflect the modified value of the corporation. One-third of this total figure is the amount owed to plaintiff as of the valuation date. To determine the total amount of interest due on that figure, the Court will first determine the amounts and time periods of any principal credits, and thus interest abatements, pursuant to the First Circuit's directive. Then, any remaining payments made by defendant WRC will be applied first to any interest accrued as of the payment date, applying any remainder to the principal to create, in effect, a further principal credit and interest abatement. As the amount of the principal changes, interest due will be calculated appropriately to generate the total amount of interest due. The total amount due plaintiff will be one-third of the modified value of the corporation plus the total amount of interest due.

## III. Standard for Decision in Bench Trials

Pursuant to Federal Rule of Civil Procedure 52(a), this Court may enter judgment following a trial without a jury. *See* Fed.

R.Civ.P. 52(a). In crafting a decision following a bench trial, the Court "shall find the facts specially and state separately its conclusions of law thereon[.]" *Id.* This Court will do so for each stage of the calculation.

IV. Deferred Tax Liability Calculation

The First Circuit concluded that the valuation of defendant WRC "must include the expected tax liability that will be incurred on the three specifically planned sales and transfers [contained in the Payment Plan]." *Bogosian,* 158 F.3d at 7. The Court was referring to the sale of the Rte. ·2/117 property, which had actually already taken place in 1992, the sale or transfer of the Snow Street Block and the sale or transfer of the Jamestown Apartments, both of which were planned as of the date of the First Circuit's ruling.

Since that time, however, the plan for funding of the share purchase has been modified. At the time of the bench trial, defendant WRC had actually sold three properties in addition to the Rte. 2/117 property: a property known as the TGIF property, the Jamestown Apartments and the Snow Street Block. Like the proceeds from the sale of Rte. 2/117, the proceeds from these sales were deposited into the Registry of Court to satisfy defendant WRC's pending obligation to plaintiff. In addition, a fifth sale of the Seabury Apartments was planned. The parties disagree about the way in which to apply the First Circuit's ruling to the modified plan.

■ Defendant WRC first argues that the deferred tax liability should be calculated utilizing a "current value financial statement." On such a statement, the "deferred" tax liability is calculated using the basis of the real estate, the value of the real estate as of the valuation date and the tax rates as of the valuation date. In other words, the tax liability is calculated as if the real estate were actually sold on the valuation date. Defendant argues that this Court should include in such a calculation all of defendant WRC's real estate

assets as of the valuation date in order to reflect the corporation's true value. In the alternative, defendant argues that the four properties already sold and the one property poised for sale should be included in the calculation.

Such an approach, however, clearly flies in the face of the First Circuit's ruling. The underlying premise of a current value financial statement, as defendant WRC admits, is that the tax liability is inherent in the value of the asset because it will be incurred if the property is sold. The First Circuit clearly rejected this premise when it held that such "potential liabilities" could not be taken into account when valuating the corporation unless the stock purchase compelled defendant WRC to make the property sales. *Bogosian,* 158 F.3d at 6. A current value financial statement calculated using all of defendant WRC's assets is thus inappropriate. Furthermore, even if this Court were to limit a current financial statement approach to properties actually sold, the calculation would still be flawed as it would be based entirely on hypothetical values (the estimated values of the properties as of the valuation date), despite the fact that the actual tax costs incurred can be identified with certainty. This Court is satisfied that the First Circuit, in focusing on actual occurrences instead of hypotheticals, did not intend such a result.

■ Therefore, this Court will calculate the deferred tax liability on the basis of actual tax costs incurred. A question remains, however, as to which properties to include in the calculation. Plaintiff argues that the planned sale of the Seabury Apartments should not be included if the sale is not necessary to satisfy defendant WRC's obligation to purchase plaintiff's shares. This Court agrees. As will be evident from the final calculations, defendant WRC had, as of the time of the bench trial, already made payments in excess of its total obligation to plaintiff. Consequently, the Seabury Apartments sale is

not "compelled" by the stock purchase obligation and should not be included in the calculation. *Bogosian*, 158 F.3d at 6. Since the proceeds of the other four sales were deposited into the Registry of Court and at least a portion of each is necessary to satisfy defendant WRC's obligation to plaintiff, the tax costs of those sales will be used to calculate the deferred tax liability of the corporation.

Based on the evidence presented at the bench trial, this Court makes the following factual findings regarding the tax liability incurred on those four sales: 1) the sale of Rte. 2/117 produced a tax liability of $1,093,642, 2) the sale of the Snow Street Block produced a tax liability of $ 40,302, 3) the sale of TGIF produced a tax liability of $728,773 and 4) the sale of the Jamestown Apartments produced a tax liability of $1,783,180.

A further step is necessary, however, since the tax liabilities were incurred years after the valuation date: the amounts must be discounted to their present value as of the valuation date. The concept of present value reflects the financial reality that a dollar that is paid in the future is not worth the same as a dollar paid today. Thus, this Court will determine the value of the tax payments as of the valuation date by discounting the payments at an appropriate discount rate.

Not surprisingly, the parties disagree about several assumptions to be applied to the present value calculation.

■ First, plaintiff argues that the payment amount to be discounted should be the amount of taxes defendant WRC actually paid in the relevant tax year, instead of the taxes due as a result of the sales. Specifically, plaintiff points to the fact that defendant WRC offset the tax amount due on the sales of the Snow Street Block, TGIF and the Jamestown Apartments substantially by taking interest deductions on amounts paid to plaintiff in those years.

This Court disagrees that payments made to plaintiff can be used to decrease the amount of defendant WRC's deferred tax liability. Regardless of the way in which defendant WRC funded the purchase of plaintiff's shares, it would eventually have recorded interest deductions for payments made to plaintiff. Those deductions would have been used to offset defendant WRC's tax liability, probably over a number of years. Therefore, even though those deductions happened to be used to offset capital gains taxes incurred as a result of property sales, defendant WRC still bore an overall increased tax burden equal to the amount of taxes due as a result of the sales. The value of defendant WRC must be reduced by that amount. This is clearly what the First Circuit meant by "tax liability . . . incurred." *Bogosian*, 158 F.3d at 7. Plaintiff will bear her responsibility for the tax burden when she receives one-third of the reduced value of the corporation.

■ Plaintiff further argues that her share of the tax burden should be apportioned to represent the percentage, on each property sold, of the gross sales price that was actually paid to her. Again, plaintiff misunderstands the rationale for this exercise. The First Circuit held that the value of defendant WRC was to be discounted by the tax liability incurred as a result of property sales "compelled" by defendant WRC's obligation to purchase plaintiff's shares. *See id.* at 6–7. It is irrelevant how much money plaintiff actually received from the sales—if even a portion of the sale was necessary to satisfy defendant WRC's obligation, then it is clear that plaintiff must shoulder one-third of. the tax burden incurred as a result of the sale.

■ Next, defendant WRC argues that the date from which the tax liability is discounted should be the date on which the properties were sold. Plaintiff argues that the appropriate date is the date on which the taxes were due. Because defendant WRC was required to make a tax payment on the date on which the taxes were due

and not before, this Court agrees with plaintiff. Based on the evidence presented at trial, this Court finds that the tax due dates were as follows: 1) December 15, 1993 for Rte. 2/117, 2) December 15, 1998 for the Snow Street Block and TGIF and 3) December 15, 1999 for the Jamestown Apartments.

■ Finally, the parties disagree on the appropriate discount rate. Plaintiff argues that the appropriate benchmark for choosing a discount rate is defendant WRC's historic borrowing rate. Plaintiff's expert testified at trial that because defendant WRC had substantial debt, any money not paid out in taxes was used to reduce that debt and, thus, a borrowing rate would be an appropriate measure of the "value" of the future tax payments to the corporation. Based on defendant WRC's historic borrowing, plaintiff's expert opined that a rate of 10% would be appropriate.

However, defendant's expert testified that the proper benchmark in determining a discount rate is instead a rate of return on investments, because the purpose of the calculation is to determine how much money the corporation would have needed to set aside on the valuation date to fund the future tax payments. Because using the money to reduce debt would not have created any funds with which to pay the taxes, defendant's expert testified that use of a borrowing rate to determine the discount rate was inappropriate.

This Court credits the testimony of defendant's expert, because it reflects the proper purpose of a present value calculation. *See, e.g., Matter of Fi–Hi Pizza, Inc.,* 40 B.R. 258, 261 (Bankr.D.Mass.1984) (Explaining the concept of present value to mean that "[n]ot only does inflation deflate the value of what a dollar may purchase in the future, but a party that has a dollar today may invest it in a variety of investments that would yield a return.") This Court will thus use an investment rate of return as a guide to determine the appropriate discount rate.

■ Defendant argues that the appropriate rate of return is between 3% and 5%, based on two factors. First, defendant WRC had an actual investment which yielded between 2% and 3% over the relevant time period. Second, defendant WRC's expert opined that a rate between 3% and 5% was appropriate, based on the cumulative average rate of 30–day U.S. Treasury Bills in the relevant years, discounted by the effective tax rate to reflect the tax liability on the interest income earned.

Plaintiff argues that, if an investment rate of return is to be used, defendant's figures are too low. Plaintiff notes that the actual investment to which defendant WRC refers is tax exempt, resulting in a lower rate of return than a taxable investment with similar risk. In addition, while acknowledging that U.S. Treasury Bills are an appropriate vehicle with which to fund future tax payments, plaintiff notes that they are also available with 13–week and 52–week terms. Defendant's expert testified on cross examination that the rate of return on those bills would be higher than the rate on a 30–day bill and that all three bills were equally secure. Finally, plaintiff argues that defendant WRC's expert's reduction based on the tax rate falsely deflates the actual rate of return on 30–day U.S. Treasury Bills.

For all of the reasons plaintiff cites, this Court is satisfied that defendant WRC's suggested discount rate is too low. However, plaintiff, in focusing on its "borrowing rate" approach, offered no counter evidence at trial to guide the Court in choosing an appropriate investment rate of return on which to base the discount rate. Thus, based on the cumulative average rates of 30–day U.S. Treasury Bills contained in the record, which are between 5.3% and 6.3%, and accounting for an increase in the rate of return corresponding to an increasing term, this Court concludes that defendant WRC could have reasonably invested at a rate

of 7% to fund the tax payments. Therefore, 7% will be the discount rate applied.

The deferred tax calculation is set forth in Figure 1. The total amount of deferred taxes is $2,611,583.27. Subtracting that from the special master's valuation of $14,-705,404 yields $12,093,820.73. Plaintiff's one-third share is $4,031,273.58.

## V. Interest Calculation

### A. Settlement Intransigence

■ Defendant argues that plaintiff should be awarded no interest because of her "settlement intransigence." Defendant WRC presented this argument to Judge Boyle, who rejected it in his July, 1997 order, stating that "neither party has proven entitlement to an equitable adjustment in the interest rate because of alleged wrongdoing by the other in the course of this action." *Bogosian*, 973 F.Supp. at 110. The First Circuit affirmed, stating that "[a]ny judgment about the reasonableness of the parties' positions on settlement is peculiarly within the expert knowledge of the district judge[.]" *Bogosian*, 158 F.3d at 11. Plaintiff argues that defendant cannot now raise the issue again.

Defendant WRC argues, however, that its claim is based on the new calculation of the corporation's value, which includes a deduction for deferred tax liability. Specifically, the now final determination of the amount owed to plaintiff for her shares is less than a $4.1 million settlement offer defendant WRC argues it made in January, 1991. Based on the new calculation, defendant WRC argues that plaintiff should receive no interest from the date of the settlement offer.

While this Court agrees that it may consider such a claim based on the modified valuation of the corporation, it rejects defendant's argument.

Statutes that award prejudgment interest generally serve the dual purposes of encouraging the early settlement of claims and compensating plaintiffs for waiting for recompense to which they were legally entitled. *See Martin v. Lumbermen's Mut. Cas. Co.*, 559 A.2d 1028, 1031 (R.I. 1989) (citations omitted). Defendant relies on *Martin* to argue that these purposes will not be served in this case where plaintiff rejected a settlement offer which was higher that her ultimate recovery. *Martin* involved an insurance claim where the defendant insurance company offered the plaintiff the applicable policy's limit. *See id.* at 1029. The plaintiff rejected the settlement offer and sued, arguing that a particular notice provision of the Massachusetts Automobile Rating and Accident Prevention Bureau, which would raise the applicable policy's limit, was triggered by Rhode Island law. *See id.* The Supreme Court of Rhode Island rejected this argument as being totally unsupported by Rhode Island law, and held that plaintiff's recovery was restricted to the policy limit. *See id.* at 1030–1031. Addressing the question of prejudgment interest, the Court concluded that neither of the above purposes would be served by awarding plaintiff prejudgment interest because the defendant had made an offer to settle at the policy limit and because "the delay [in plaintiff's receipt of the insurance proceeds] was caused entirely by the litigation [the plaintiff] commenced." *Id.*

This Court finds *Martin* inapplicable for several reasons. First, as plaintiff argues, defendant WRC's settlement offer was not for $4.1 million outright in January, 1991, but rather was a structured settlement offer which included a $2 million note, payable over five years bearing interest at the prime rate. Plaintiff is correct that defendant WRC has failed to establish that such a settlement would have been equal to or greater than her recovery calculated herein, given the concept of present value discussed above.

Second, the situation here is distinguishable from an insurance claim for a policy limit where the value of plaintiff's claim is known with certainty. Many variables go into the valuation of a corporation. It has

taken ten years to finally come to a valuation of defendant WRC, and this Court will not find that the delay was "entirely" caused by plaintiff, such that she should not be compensated for waiting that long to recover. The issues involved in valuating the corporation have been complex, unlike in *Martin,* and were being raised by both sides, such that it would have been impossible for plaintiff to predict her ultimate recovery. Indeed, if this Court had accepted plaintiff's suggested discount rate in the deferred tax liability calculation, the defendant WRC's argument would fail entirely, because the value of the shares would have been greater than the alleged $4.1 million settlement offer. Judge Boyle refused to find any "wrongdoing" by plaintiff, *Bogosian,* 973 F.Supp. at 110, and the fact that the value calculated herein is slightly less than Judge Boyle's award does not alter that finding.

Therefore, this Court concludes that plaintiff was reasonable in refusing to settle for defendant WRC's January, 1991 offer. She will receive prejudgment interest as contemplated in R.I.Gen.Laws § 7-1.1-90.1.

### B. Prejudgment Interest Rate

In his July, 1997 order, Judge Boyle concluded that plaintiff should receive prejudgment interest at a rate of 11% compounded monthly. *See Bogosian,* 973 F.Supp. at 110. Judge Boyle, noting that R.I.Gen.Laws § 7-1.1-90.1 did not specify either a rate or a method of calculating interest, arrived at this award after extensive hearings and analysis. *See id.* at 107-110. The First Circuit affirmed the rate of 11%, but concluded that the interest should be simple instead of compound. *See Bogosian,* 158 F.3d at 9. Normally, this directive from the Court of Appeals would end the matter.

■ However, on July 1, 1999, the Rhode Island legislature amended § 7-1.1-90.1 to specify that a petitioner for dissolution whose shares will be purchased is entitled to interest on the share value

"at the rate on judgments in civil actions." R.I.Gen.Laws § 7-1.1-90.1 (1999). Both parties agree that the amended statute applies in the case at bar. *See Zawatsky v. Cohen,* 463 A.2d 210, 213 (R.I.1983) (awarding prejudgment interest in accordance with recently amended statute because "the interest on a judgment is determined in accordance with the statute in effect at the time of its rendition rather than at the time the action accrued.").

Rhode Island law sets the prejudgment interest rate in civil cases at 12% per annum, simple. *See* R.I.Gen.Laws. § 9-21-10 (1997). Defendant argues, however, that because the amendment specifies that interest will be calculated "at the rate *on judgments* in civil actions[,]" R.I.Gen.Laws § 7-1.1-90.1 (1999) (emphasis added), a post-judgment rate should be applied. Further, defendant argues that when the statute is being applied in federal court, as is the case here, the Rhode Island legislature intended that the federal post-judgment interest rate in civil actions be applied. Thus, defendant argues that 28 U.S.C. § 1961, which provides for a post-judgment interest rate tied to U.S. Treasury Bills, *see* 28 U.S.C. § 1961 (1994), should be applied to determine the interest rate in this case. Defendant's argument is without merit.

■ Using statutory construction principles prescribed by the Supreme Court of Rhode Island, this Court concludes that § 7-1.1-90.1 compels the application of the Rhode Island prejudgment interest rate of 12%. "When construing a statute, [the Court] must consider it in its entirety. [The Court] must interpret it so as to give it the meaning most consistent with its policies or obvious purposes. Moreover, legislation should not be given a meaning that leads to an unjust, absurd, or unreasonable result." *City of Warwick v. Almac's, Inc.,* 442 A.2d 1265, 1272 (R.I. 1982) (citations omitted). The purpose of § 7-1.1-90.1 is clearly to award prejudgment interest: "The petitioner is entitled

to interest, at the rate on judgments in civil actions, on the purchase price of the shares *from the date of the filing of the election to purchase the shares* [.]" R.I.Gen.Laws § 7–1.1–90.1 (1999) (emphasis added). Although the intended rate could have admittedly been specified more clearly, to conclude that a post-judgment rate was intended would be entirely inconsistent with this purpose.[3]

Thus, plaintiff is entitled to prejudgment interest at the rate of 12%, simple.

C.  Interest Abatement on the $1,095,000 Deposited in the Registry of Court

The First Circuit held that defendant WRC is entitled to a principal credit, and thus an interest abatement, on the $1,095,000 it deposited into the Registry of Court from the date of deposit. *See Bogosian,* 158 F.3d at 9. Based on the evidence presented at trial, this Court finds that the date of deposit for $95,000 is March 28, 1994 and the date of deposit for $1 million is April 28, 1994.

These abatements are reflected in Figure 2.

D.  Interest Abatement on the $1 Million Delivered in December, 1992

The First Circuit also held that defendant WRC is entitled to a principal credit, and thus an interest abatement, on $1 million from the time that the checks totaling that amount were delivered to plaintiff's attorneys, December 23, 1992, to the

time that the drawing account's overdraft protection expired. *See id.* at 10. As to the period following expiration, the Court stated that defendant WRC's entitlement to any further interest abatement was a decision within the equitable discretion of this Court. *See id.*

Both parties agree that the $1 million deposited in the Registry of Court on April 28, 1994 is the same money originally offered to plaintiff in the December, 1992 checks. Thus, as the parties recognize, any interest abatement from April 28, 1994 would be duplicative, since defendant WRC is already receiving an interest abatement from that date. *See id.* at 9.[4]

Defendant, however, argues that it is entitled to an interest abatement for the period following the expiration date until April 28, 1994 because it "should not be required to pay [plaintiff] 11% interest on monies she refused to accept." Def's Post Trial Mem. at 12.

Presumably, defendant is relying upon the principle enunciated by the First Circuit that "interest will not accrue after a valid tender." *Bogosian,* 158 F.3d at 9 (citing *Garfinkle v. Chestnut Hill Mortgage Corp.,* 679 F.2d 276, 278 n. 3 (1st Cir.1982)). Under this rule, defendant WRC is correct that it should not have to pay interest on money validly tendered but refused. However, after the drawing account's overdraft protection expired, defendant WRC's tender of the funds was no longer valid, because plaintiff could not have secured the money even if she had so

---

3.  The Court further notes that even if the Rhode Island legislature intended a post-judgment interest rate to be utilized, defendant's assertion that the federal post-judgment interest rate would apply when the action is in federal court is certainly questionable. The statute does not contain any language indicating that the applicable interest rate depends upon the forum in which the dissolution petition was brought. However, because this Court concludes with ease that the use of Rhode Island's prejudgment interest rate was intended, this Court need not reach that issue.

4.  It is noted that defendant WRC is slightly inconsistent on this point. In its first post-trial memorandum, defendant WRC argues that it is entitled to an interest abatement only until the funds were deposited in the Registry of Court. *See* Def's Post Trial Mem. at 12. However, in its reply brief, it claims that it is entitled to an abatement "to the present[.]" Def's Reply Mem. at 13. Because it is clear from the record that the December, 1992 tender and the April, 1994 deposit utilized the same $1 million, this Court will assume that defendant is not attempting to receive a double abatement from April, 1994.

wished. Therefore, an interest abatement after that date is inappropriate. An interest abatement for the time period during which the checks could have been cashed is sufficient to penalize plaintiff for her "bad strategy" of refusing to cash the checks. *Id.* Any further abatement would award an unjustified windfall to defendant WRC, who had full use and enjoyment of the funds from the date the overdraft protection expired until they were later deposited into the Registry of Court.

Plaintiff presented uncontroverted evidence at trial that the overdraft protection expired on April 20, 1993. Thus, this Court finds that this is the appropriate date to use in calculating the interest abatement.

Therefore, defendant WRC will only receive a principal credit, and therefore an interest abatement, on the $1 million from December 23, 1992 until April 20, 1993.

This interest abatement is reflected in Figure 2.

E. Other Payments

As a result of Judge Boyle's July, 1990 order and of its own volition in some cases, defendant WRC has made various payments over the past eleven years to satisfy its obligations in addition to the $1 million and the $1,095,000 discussed above. Defendant WRC is now arguing in its post-trial memorandum that it is entitled to principal credits, and thus interest abatements, for all of those payments. In his July, 1997 opinion, Judge Boyle addressed this issue and concluded that defendant

WRC was not entitled to principal credits for any payments it had made. *See Bogosian,* 973 F.Supp. at 112. Judge Boyle directed that all payments already made by defendant WRC and those made in the future were to be applied according to the "United States Rule," which dictates that payments are applied first to interest due as of the payment date with any excess to be applied to the principal. *See id.* at 110 (citing *Darr v. Muratore,* 8 F.3d 854, 861 (1st Cir.1993) (the "United States Rule" applies in Rhode Island)). Although defendant WRC did appeal this issue with regard to the $1 million tendered in December, 1992 and the $1,095,000 deposited in the Registry of Court, as discussed above, it apparently did not challenge Judge Boyle's ruling with regard to the remainder of the payments. *See generally Bogosian,* 158 F.3d at 9–10.[5]

An issue not raised on appeal is considered waived. *See Beatty v. Michael Business Machines Corp.,* 172 F.3d 117, 120 n. 2 (1st Cir.1999). Thus, at least as to payments made before the date of Judge Boyle's ruling, defendant WRC may not now argue that it is entitled to principal credits.[6]

Judge Boyle's ruling regarding future payments, however, is arguably dicta, and this Court finds it appropriate to revisit the issue in light of the First Circuit's ruling. In granting defendant WRC principal credits on the $1 million for the time period in which the checks could be cashed and the $1,095,000 from the date of deposit into the Registry of Court, the First Cir-

---

**5.** The only other abatement request addressed by the First Circuit was for $2,300,000 that defendant WRC claimed it would have paid plaintiff if it had been permitted to refinance the Jamestown Apartments in 1991. *See Bogosian,* 158 F.3d at 10. The reason it could not do so was plaintiff's objection to a substitution of collateral for the mortgage she held on the property. *See id.* The First Circuit affirmed Judge Boyle's denial of the abatement, *see id.,* and that issue is not now before this Court.

**6.** The likely reason for defendant's turn-around is the recent disallowance by the Internal Revenue Service ("IRS") of interest deductions for payments made by defendant WRC to plaintiff until September 30, 1997. However, defendant WRC does not cite and this Court cannot find any authority suggesting that an IRS classification of a particular tax deduction binds this Court in a subsequent judicial proceeding. To the extent that this inconsistency in classification adversely affects defendant WRC, its remedy lies, if at all, with the IRS.

cuit relied upon the rule that "interest will not accrue after a valid tender." *Bogosian*, 158 F.3d at 9 (citing *Garfinkle*, 679 F.2d at 278 n. 3). Although the First Circuit did not so specify, the *Garfinkle* rule applies only to a valid tender of a "principal payment due[,]" not to every payment made by a debtor. *Garfinkle*, 679 F.2d at 277. Therefore, the First Circuit clearly considered the tender of $1 million and the deposit of $1,095,000 to be "principal" payments, most likely because those payments were made with proceeds from a property sale pursuant to the Payment Plan proposed by defendant WRC. Since the Payment Plan was intended to detail the manner in which the share purchase itself would be funded, this is a reasonable basis on which to distinguish those payments from other payments made by defendant WRC.

█ This Court concludes that the First Circuit would have found other payments made from proceeds of real estate sales to be principal payments and, under the *Garfinkle* rule, defendant WRC is thus entitled to principal credits on those amounts from the date of payment. Based on the evidence produced at trial, this Court finds that those payments are as follows: 1) $1,196,498 on November 10, 1997, from the sale of TGIF, 2) $690,000 on July 29, 1998, from the sale of the Snow Street Block and 3) $3 million on July 28, 1999, from the sale of the Jamestown Apartments. Principal credits, and thus interest abatements, for the first two amounts are reflected in Figure 2. Because this Court stopped interest from running prior to the third payment, no interest abatement is involved.

The remainder of defendant WRC's payments will be applied first to interest, with any remainder to be applied to the principal.

Several of these remaining payments were made not to plaintiff or the Registry of Court, but to the special master to satisfy the costs of the valuation proceedings. In his July, 1997 order, Judge Boyle determined that plaintiff should bear one-third of those costs. *See Bogosian*, 973 F.Supp. at 113. Defendant WRC has therefore identified various payments made over the years to the special master equaling plaintiff's one-third share. The parties have stipulated that these payments may be credited toward the amount owed plaintiff. The parties, however, disagree about the timing of the credit. Defendant argues that it should be credited with payment to plaintiff on the dates on which payment was made to the special master. Plaintiff argues that payments made before July 31, 1997 should only be credited on that date because that is when plaintiff's obligation to pay a portion of the costs arose. The Court notes that, in light of its ruling denying principal credits for these amounts, the date of the credit will not affect the overall amount defendant WRC owes plaintiff.

However, for the purposes of facilitating the calculations, this Court will specify the appropriate credit dates. This Court agrees with plaintiff. Under the statute, Judge Boyle could have allocated all of the valuation costs to defendant WRC, *see* R.I.Gen.Laws § 7–1.1–90.1 (1999); therefore, plaintiff did not owe any payment toward these costs until July 31, 1997. This Court will therefore credit payments made before July 31, 1997 on that date and any subsequent payments on the date on which they were made.

At the bench trial, a stipulation was entered detailing all of defendant WRC's payments, including those to the special master, and this Court accepts the stipulation as fact. The payments are listed in Figure 2. The total is $8,122,926. The application of these payments first to interest accrued as of the payment date and then to principal is also reflected in Figure 2.

F. Total Interest

The total interest award is thus $3,808,-801.05, as detailed in Figure 2.

## VI. Conclusion

The total due plaintiff for her shares is therefore $7,840,074.63. As noted, defendant WRC has made payments over the years totaling $8,122,926.40. Based on the parties' stipulation and the Registry of Court records, $2,949,667.98 of these payments were made either directly to plaintiff or to others on her behalf.[7] Plaintiff is therefore still owed $4,890,406.56. The remainder of defendant WRC's total payments, in the amount of $5,173,258.42, were made into the Registry of Court. Since this amount exceeds the amount still owed plaintiff, defendant WRC is entitled to a refund from the Registry of Court, in the amount of $282,851.77 (plus interest accumulated thereon while in the Registry).

The money remaining in the Registry of Court (which includes interest earned on defendant WRC's remaining deposits) is subject to the claims of a number of plaintiff's creditors in the interpleader case. These claims must be resolved before those funds can be properly distributed. As noted above, this Court consolidated the interpleader case and plaintiff's original dissolution petition some three years ago. Since the First Circuit frowns on piecemeal appeals (and there have already been too many throughout this litigation), no judgment shall enter until the claims of the interpleader parties are finally resolved.

Furthermore, plaintiff's Amended Complaint contained two counts against her brothers individually, in addition to the dissolution petition: one alleging "Oppression of Minority Shareholder" and one alleging "Civil Conspiracy." After defendant WRC elected to purchase plaintiff's shares, defendants James and Harry Woloohojian filed an answer to the Amended Complaint which contained a counterclaim alleging breach of fiduciary duty. Plaintiff replied to the counterclaim and demanded a jury trial on that claim. However, these claims have never been further addressed by the parties, nor have they been formally dismissed. No judgment shall enter until these claims are resolved.

There will be no distribution of funds to plaintiff and/or to plaintiff's creditors until the above issues are resolved and final judgment is entered.

It is so ordered.

Figure 1

## DEFERRED TAX LIABILITY CALCULATION

| | As of Discount Rate: | | 1/19/89 7% | | |
|---|---|---|---|---|---|
| Property | Taxes Incurred | Taxes Due | Years | Discount Rate | Discounted Taxes * |
| Rte 2/117 | $1,903,642.00 | 12/15/93 | 4.91 | 7% | $1,365.851.58 |
| Snow St. | $40,302.00 | 12/15/98 | 9.91 | 7% | $20,613.20 |
| TGIF | $728,773.00 | 12/15/98 | 9.91 | 7% | $372,744.39 |
| Jamestown | $1,783,180.00 | 12/15/99 | 10.91 | 7% | $852,374.10 |
| | | | | TOTAL DISCOUNTED TAXES: | $2,611,583.27 |

\* Calculated using Microsoft Excel Present Value Formula

Figure 2

**7.** These payments consist of: 1) the $10,000 monthly payments ordered by Judge Boyle, which total $600,000, 2) the $1,095,000 deposited in the Registry of Court in the spring of 1994, which, after earning interest for several years, was paid out of the Registry to satisfy plaintiff's obligations to some of her former lawyers, 3) the payments made to the special master, totaling $17,450, 4) a forgiveness of debt in the amount of $867,130 and 5) various other payments made over the years totaling $370,087.98.

## APPLICATION OF PAYMENTS TO INTEREST/PRINCIPAL

Interest as of 2/16/89          On Principal Amount of $4,031,273.58    At 12% per annum, simple

| Date | Principal Due | Interest Due This Period * | Total Interest Outstanding | Payment ** | Amt. to Principal | New Principal | Interest Paid | Interest Outstanding |
|---|---|---|---|---|---|---|---|---|
| 2/19/89 | $4,031,273.58 | $3,976.05 | $3,976.05 | $127,000 | $123,023.95 | $3,908,249.63 | $3,976.05 | $0.00 |
| 7/15/90 | $3,908,249.63 | $656,585.94 | $656,585.94 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $646,585.94 |
| 11/15/90 | $3,908,249.63 | $158,043.19 | $804,629.13 | $140,000 | $0 | $3,908,249.63 | $140,000.00 | $664,629.13 |
| 1/15/91 | $3,908,249.63 | $78,379.14 | $743,008.27 | $20,000 | $0 | $3,908,249.63 | $20,000.00 | $723,008.27 |
| 2/15/91 | $3,908,249.63 | $39,832.02 | $762,840.29 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $752,840.29 |
| 3/15/91 | $3,908,249.63 | $35,977.31 | $788,817.61 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $778,817.61 |
| 4/15/91 | $3,908,249.63 | $39,832.02 | $818,649.63 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $808,649.63 |
| 5/15/91 | $3,908,249.63 | $38,547.12 | $847,196.75 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $837,196.75 |
| 6/15/91 | $3,908,249.63 | $39,832.02 | $877,028.77 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $867,028.77 |
| 7/15/91 | $3,908,249.63 | $38,547.12 | $905,575.89 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $895,575.89 |
| 8/15/91 | $3,908,249.63 | $39,832.02 | $935,407.92 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $925,407.92 |
| 9/15/91 | $3,908,249.63 | $39,832.02 | $965,239.94 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $955,239.94 |
| 9/30/91 | $3,908,249.63 | $19,273.56 | $974,513.50 | $867,130 | $0 | $3,908,249.63 | $867,130.00 | $107,383.50 |
| 10/15/91 | $3,908,249.63 | $19,273.56 | $126,657.06 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $116,657.06 |
| 11/15/91 | $3,908,249.63 | $39,832.02 | $156,489.08 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $146,489.08 |
| 12/15/91 | $3,908,249.63 | $38,547.12 | $185,036.20 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $175,036.20 |
| 1/15/92 | $3,908,249.63 | $39,832.02 | $214,868.23 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $204,868.23 |
| 2/15/92 | $3,908,249.63 | $39,832.02 | $244,700.25 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $234,700.25 |
| 3/15/92 | $3,908,249.63 | $35,977.31 | $270,677.56 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $260,677.56 |
| 4/15/92 | $3,908,249.63 | $39,832.02 | $300,509.59 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $290,509.59 |
| 5/15/92 | $3,908,249.63 | $39,832.02 | $330,341.61 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $320,341.61 |
| 6/15/92 | $3,908,249.63 | $39,832.02 | $360,173.63 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $350,173.63 |
| 7/15/92 | $3,908,249.63 | $39,832.02 | $390,005.66 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $380,005.66 |
| 8/15/92 | $3,908,249.63 | $39,832.02 | $419,837.68 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $409,837.68 |
| 9/15/92 | $3,908,249.63 | $39,832.02 | $449,669.70 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $439,669.70 |
| 10/15/92 | $3,908,249.63 | $39,832.02 | $479,501.73 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $469,501.73 |
| 11/15/92 | $3,908,249.63 | $39,832.02 | $509,333.75 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $499,333.75 |
| 12/15/92 | $3,908,249.63 | $39,832.02 | $539,165.77 | $10,000 | $0 | $3,908,249.63 | $10,000.00 | $529,165.77 |
| 12/23/92 | $3,908,249.63 | $10,279.23 | $539,445.01 | $1,000,000 | $1,000,000 | $2,908,249.63 | $0.00 | $539,445.01 |
| 1/15/93 | $2,908,249.63 | $21,991.15 | $561,436.15 | $10,000 | $0 | $2,908,249.63 | $10,000.00 | $551,436.15 |
| 2/15/93 | $2,908,249.63 | $29,640.24 | $581,076.40 | $10,000 | $0 | $2,908,249.63 | $10,000.00 | $571,076.40 |
| 3/15/93 | $2,908,249.63 | $26,771.83 | $597,848.23 | $10,000 $ − 1,000,00 | $0 | $2,908,249.63 | $10,000.00 | $587,848.23 |
| 4/20/93 | $2,908,249.63 | $34,420.93 | $622,269.16 | 0 | $ − 1,000,000 | $3,908,249.63 | $0.00 | $622,269.16 |
| 3/28/94 | $3,908,249.63 | $489,437.16 | $1,061,706.32 | $95,000 | $95,000 | $3,813,249.63 | $0.00 | $1,061,706.32 |
| 4/28/94 | $3,813,249.63 | $38,863.80 | $1,100,570.12 | $1,000,000 | $1,000,000 | $2,813,249.63 | $0.00 | $1,100,570.12 |
| 5/15/95 | $2,813,249.63 | $353,313.32 | $1,453,883.45 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,443,883.45 |
| 5/26/95 | $2,813,249.63 | $10,173.94 | $1,454,057.39 | $103,088 | $0 | $2,813,249.63 | $103,087.98 | $1,350,969.41 |
| 6/15/95 | $2,813,249.63 | $18,498.08 | $1,369,467.49 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,359,467.49 |
| 7/15/95 | $2,813,249.63 | $27,747.12 | $1,387,214.61 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,377,214.61 |
| 8/15/95 | $2,813,249.63 | $28,672.02 | $1,405,886.63 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,395,886.63 |
| 9/15/95 | $2,813,249.63 | $28,672.02 | $1,424,558.66 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,414,558.66 |
| 10/15/95 | $2,813,249.63 | $27,747.12 | $1,442,305.78 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,432,305.78 |
| 11/15/95 | $2,813,249.63 | $28,672.02 | $1,460,977.80 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,450,977.80 |
| 12/15/95 | $2,813,249.63 | $27,747.12 | $1,478,724.92 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,468,724.92 |
| 1/15/96 | $2,813,249.63 | $28,672.02 | $1,497,396.94 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,487,396.94 |
| 2/15/96 | $2,813,249.63 | $28,672.02 | $1,516,068.97 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,506,068.97 |
| 3/15/96 | $2,813,249.63 | $25,897.31 | $1,531,966.28 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,521,966.28 |
| 4/15/96 | $2,813,249.63 | $28,672.02 | $1,550,638.30 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,540,638.30 |
| 5/15/96 | $2,813,249.63 | $27,747.12 | $1,568,385.42 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,558,385.42 |
| 6/15/96 | $2,813,249.63 | $28,672.02 | $1,587,057.45 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,577,057.45 |
| 7/15/96 | $2,813,249.63 | $27,747.12 | $1,604,804.57 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,594,804.57 |
| 8/15/96 | $2,813,249.63 | $28,672.02 | $1,623,476.59 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,613,476.59 |
| 9/15/96 | $2,813,249.63 | $28,672.02 | $1,642,148.61 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,632,148.61 |
| 10/15/96 | $2,813,249.63 | $27,747.12 | $1,659,895.73 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,649,895.73 |
| 11/15/96 | $2,813,249.63 | $28,672.02 | $1,678,567.76 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,668,567.76 |
| 12/15/96 | $2,813,249.63 | $27,747.12 | $1,696,314.88 | $10,000 | $0 | $2,813,249.63 | $10,000.00 | $1,686,314.88 |
| 7/31/97 | $2,813,249.63 | $210,878.11 | $1,897,192.99 | $17,450 *** | $0 | $2,813,249.63 | $17,450.00 | $1,879,742.99 |
| 11/10/97 | $2,813,249.63 | $94,340.21 | $1,974,083.19 | $1,196,498 | $1,196,498 | $1,616,751.63 | $0.00 | $1,974,083.19 |
| 12/05/97 | $1,616,751.63 | $13,288.37 | $1,987,371.56 | $750 | $0 | $1,616,751.63 | $750.00 | $1,986,621.56 |
| 12/17/97 | $1,616,751.63 | $6,378.42 | $1,992,999.98 | $20,000 | $0 | $1,616,751.63 | $20,000.00 | $1,972,999.98 |
| 1/15/98 | $1,616,751.63 | $15,414.51 | $1,988,414.49 | $10,000 | $0 | $1,616,751.63 | $10,000.00 | $1,978,414.49 |
| 2/15/98 | $1,616,751.63 | $16,477.58 | $1,994,892.07 | $10,000 | $0 | $1,616,751.63 | $10,000.00 | $1,984,892.07 |
| 3/15/98 | $1,616,751.63 | $14,882.97 | $1,999,775.04 | $10,000 | $0 | $1,616,751.63 | $10,000.00 | $1,989,775.04 |
| 4/15/98 | $1,616,751.63 | $16,477.58 | $2,006,252.62 | $10,000 | $0 | $1,616,751.63 | $10,000.00 | $1,996,252.62 |
| 5/15/98 | $1,616,751.63 | $15,946.04 | $2,012,198.66 | $10,000 | $0 | $1,616,751.63 | $10,000.00 | $2,002,198.66 |
| 6/15/98 | $1,616,751.63 | $16,477.58 | $2,018,676.24 | $10,000 | $0 | $1,616,751.63 | $10,000.00 | $2,008,676.24 |
| 7/15/98 | $1,616,751.63 | $15,946.04 | $2,024,622.28 | $10,000 | $0 | $1,616,751.63 | $10,000.00 | $2,014,622.28 |
| 7/29/98 | $1,616,751.63 | $7,441.49 | $2,022,063.77 | $690,000 | $690,000 | $926,751.63 | $0.00 | $2,022,063.77 |

| Date | Principal Due | Interest Due This Period * | Total Interest Outstanding | Payment ** | Amt. to Principal | New Principal | Interest Paid | Interest Outstanding |
|---|---|---|---|---|---|---|---|---|
| 8/15/98 | $926,751.63 | $5,179.65 | $2,027,243.42 | $10,000 | $0 | $926,751.63 | $10,000.00 | $2,017,243.42 |
| 9/15/98 | $926,751.63 | $9,445.25 | $2,026,688.67 | $10,000 | $0 | $926,751.63 | $10,000.00 | $2,016,688.67 |
| 12/15/98 | $926,751.63 | $27,726.38 | $2,044,415.05 | $100,854 | $0 | $926,751.63 | $100,853.67 | $1,943,561.38 |
| 3/16/99 | $926,751.63 | $27,726.38 | $1,971,287.76 | $185,157 | $0 | $926,751.63 | $185,156.75 | $1,786,131.01 |
| 3/30/99 | $926,751.63 | $4,265.60 | $1,790,396.60 | $0 | $0 | $926,751.63 | $0 | $1,790,396.60 |
| 7/28/99 | | | | $3,000,000 | | | | |

TOTAL INTEREST DUE $3,808.801.05    TOTAL PAYMENTS: $8,122.926

\* Calculated using the following formula: ((Principal × Interest Rate)/365) × Number of days in period

\*\* Derived from party stipulations, Exhibits R & U

\*\*\* Total of payments already made for valuation proceedings, which plaintiff owed as of 7/31/97—Ex. R