# United States Court of Appeals

## For the First Circuit

No. 01-1542

ELIZABETH V. BOGOSIAN,

Plaintiff-Appellant/Cross-Appellee,

v.

WOLOOHOJIAN REALTY CORPORATION,

Defendant-Appellee/Cross-Appellant,

JAMES E. WOLOOHOJIAN, HARRY J. WOLOOHOJIAN,
PEZZUCO CONSTRUCTION CO., INC., CUMMINGS & LOCKWOOD,
AND TILLINGHAST, LICHT & SEMONOFF, ET AL.,

Appellees.

No. 02-1196

ELIZABETH V. BOGOSIAN,

Plaintiff-Appellant/Cross-Appellee,

v.

WOLOOHOJIAN REALTY CORPORATION,

Defendant-Appellee/Cross-Appellant,

JAMES E. WOLOOHOJIAN, HARRY J. WOLOOHOJIAN,
PEZZUCO CONSTRUCTION CO., INC., CUMMINGS & LOCKWOOD,
AND TILLINGHAST, LICHT & SEMONOFF, ET AL.,

Appellees.

02-1235

ELIZABETH V. BOGOSIAN,

Plaintiff-Appellant/Cross-Appellee,

v.

WOLOOHOJIAN REALTY CORPORATION,

Defendant-Appellee/Cross-Appellant,


JAMES E. WOLOOHOJIAN, HARRY J. WOLOOHOJIAN,
PEZZUCO CONSTRUCTION CO., INC., CUMMINGS & LOCKWOOD,
AND TILLINGHAST, LICHT & SEMONOFF, ET AL.,

Appellees.

_____


APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

_____


Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Cyr, Senior Circuit Judge,


_____


Richard E. Condit for appellant/cross-appellee Elizabeth
Bogosian.
William R. Grimm, with whom Brian C. Newberry and Hinckley,
Allen & Snyder LLP were on brief for appellee James H. Woloohojian
and cross-appellant Woloohojian Realty Corp.
William P. Devereaux, with whom Stephen A. Izzi and Holland &

-2-

Knight, LLP were on brief for appellee Harry Woloohojian, a/k/a Estate of Harry J. Woloohojian.

Charles D. Ray, with whom Robert P. Dolian and Cummings & Lockwood, LLC were on brief for appellee Cummings & Lockwood.

_____

March 19, 2003

_____

**CYR**, **Senior Circuit Judge**.    Plaintiff Elizabeth V. Bogosian appeals from a district court judgment which (i) rejected the contention that her two brothers conspired to "freeze" her out of the family business, and (ii) determined that she was entitled to recover not more than $4,000,000, plus prejudgment interest, for her minority interest in the business.    The defendants in turn cross-appeal from a district court ruling that their interest award should be calculated at twelve percent.    We affirm.

## I

## BACKGROUND

In 1960, the three siblings — appellant Elizabeth Bogosian and appellees James and Harry Woloohojian — established Woloohojian Realty Corporation (WRC), with a view to acquiring and managing real estate properties located in Rhode Island and Massachusetts.[1]    Each sibling held one third of the WRC shares and served as an officer in WRC.

Elizabeth Bogosian ("Bogosian") and James Woloohojian

---

[1] We relate the material facts in the light most consonant with the district court judgment.    See La Esperanza de P.R., Inc. v. Perez y Cia. de P.R., Inc., 124 F.3d 10, 12 (1st Cir. 1997).    For further detail, see Bogosian v. Woloohojian Realty Corp., 158 F.3d 1 (1st Cir. 1998); Bogosian v. Woloohojian Realty Corp., 973 F. Supp. 98 (D.R.I. 1997); Bogosian v. Woloohojian, 901 F. Supp. 68 (D.R.I. 1995), appeal dismissed, 86 F.3d 1146 (1st Cir. 1996); Bogosian v. Woloohojian, 882 F. Supp. 258 (D.R.I. 1995); Flanders + Medeiros Inc. v. Bogosian, 868 F. Supp. 412 (D.R.I. 1994), aff'd in part, rev'd in part, 65 F.3d 198 (1st Cir. 1995); Bogosian v. Woloohojian, 831 F. Supp. 47 (D.R.I. 1993); Bogosian v. Woloohojian Realty Corp., 923 F.2d 898 (1st Cir. 1991); Bogosian v. Woloohojian, 749 F. Supp. 396 (D.R.I. 1990).

-4-

turned against Harry Woloohojian in 1979, after Harry had ceased to perform any further services for WRC, yet continued to draw full salary. While still working at WRC, James and Bogosian formed a separate real estate company, E & J Realty (E & J), from which Harry was excluded.

In 1981, Bogosian acquired an option to purchase real estate in Fall River, Massachusetts ("Fall River property") in the name of "Taunton River Enterprises." For more than two years, WRC remitted fees and $3,000 monthly to maintain her purchase-option contract. The record is silent as to whether WRC was ever reimbursed by Bogosian. Be that as it may and unbeknownst to James, Bogosian exercised the purchase option in 1984, in the name of E & J, rather than WRC, thereby effectively excluding Harry Woloohojian from the deal. Subsequently, when Harry confronted James regarding Bogosian's acquisition of the Fall River property through E & J, James assured Harry that he regarded the property as an asset of WRC, rather than E & J, then promised to help Harry regain title to the property on behalf of WRC. By 1986, James and Harry, having become fully reconciled, voted to install James in place of Bogosian as the WRC president. Although Bogosian immediately ceased to perform any further services as an officer/employee, she continued to draw her full salary from WRC.

In 1987, James, Harry, and WRC instituted a civil action in the Massachusetts courts against Bogosian and E & J ("Fall River

litigation"), claiming that the decision by Bogosian to acquire the Fall River real estate in the name of E & J constituted a wrongful usurpation of a corporate opportunity belonging to WRC. The complaint demanded that title to the Fall River property be conveyed to WRC, which resulted in a <u>lis</u> <u>pendens</u> against the property. Meanwhile, Bogosian had received three offers to purchase the Fall River property, ranging from five to eleven million dollars. These offers were never consummated, however, for reasons unrelated to the <u>lis</u> <u>pendens</u>.

In 1988-89, James Woloohojian, in his capacity as the president of WRC, fired Bogosian and her children. Thereafter, Bogosian brought the instant diversity action in the United States District Court for the District of Rhode Island. The three-count amended complaint alleged that WRC, as well as James and Harry Woloohojian, had breached, and/or conspired to breach, their fiduciary duties to her by "freezing her out" of her positions as president, minority shareholder, and employee of WRC, and demanded the dissolution of WRC (count 3).[2] In order to avoid a corporate

---

[2]R. I. Gen. Laws § 7-1.1-90(a)(1)(ii) provides, in pertinent part:

> The superior court has full power to liquidate the assets and business of a corporation . . . [i]n an action by a shareholder when it is established that, whether or not the corporate business has been or could be operated at a profit, dissolution would be beneficial to the shareholders because . . . [t]he acts of the directors or those in control of the

dissolution, however, the defendants elected to purchase Bogosian's WRC shares at "fair value," pursuant to R.I. Gen. Laws § 7-1.1-90.1.[3] Subsequently, the district court directed the defendants to commence making payments into the court registry. The defendants responded with a counterclaim asserting that Bogosian had converted other WRC funds to her personal use as well.

In 1992, the Fall River litigation pending in Massachusetts state court was terminated following a jury finding that Bogosian had not usurped a WRC corporate opportunity.

In 1993, after Bogosian's many creditors asserted claims to the monies previously deposited in the court registry by WRC, WRC responded with an interpleader action. Thereafter, the district court directed an administrative consolidation of the interpleader action with the pending proceeding brought by

---

corporation are illegal, oppressive, or fraudulent.

[3]Section 7-1.1-90.1 provides, in pertinent part:

Whenever a petition for dissolution of a corporation is filed by one or more shareholders . . . pursuant to either § 7-1.1-90 or a right to compel dissolution which is authorized under § 7-1.1-51 or is otherwise valid, one or more of its other shareholders may avoid the dissolution by filing with the court prior to the commencement of the hearing, or, in the discretion of the court, at any time prior to a sale or other disposition of the assets of the corporation, an election to purchase the shares owned by the petitioner at a price equal to their fair value.

Bogosian.

In 1997, the district court (<u>Boyle</u>, S.D.J.) entered a final decision as to count 3, establishing a fair value for the share buy-out. <u>Bogosian</u> v. <u>Woloohojian Realty Corp.</u>, 973 F. Supp. 98, 106-07 (D.R.I. 1997). Thereafter, we sustained the district court ruling in part, but vacated its decision relating to two pertinent matters. First, the district court was directed to determine the one-third share of the tax liability, due by Bogosian, which had been incurred by WRC when it was compelled to sell some of its real property to fund its purchase of Bogosian's remaining shares. Second, we decided that Bogosian would be entitled to 11% <u>simple</u> prejudgment interest, rather than 11% <u>compound</u> interest. <u>Bogosian</u> v. <u>Woloohojian</u>, 158 F.3d 1, 9 (1st Cir. 1998).

On remand, the district court (Lagueux, D.J.) established the post-tax, buy-out amount at roughly $4 million, then applied a 12% interest rate based on an intervening amendment to the Rhode Island prejudgment-interest statute. Accordingly, the defendants were directed to remit approximately $7.8 million to Bogosian pursuant to their § 7-1.1-90.1 election. <u>Bogosian</u> v. <u>Woloohojian</u>, 93 F. Supp. 2d 145, 159 (D.R.I. 2000).

In April 2000, after reopening discovery at Bogosian's request, the district court scheduled counts 1 and 2 for bench trial in September 2000. Thereafter, however, Bogosian sought

-8-

several continuances and further discovery, citing her retention of new trial counsel and her recent surgery and treatment for lung cancer.

The district court granted the first two motions, but rejected a third, then set the trial date for May 8, 2001, and permitted Bogosian's trial testimony to be submitted by way of deposition. The district court conditioned its grant of the further continuances, however, by directing that no additional interest was to accrue on the count 3 fund held in the court registry.

Following the eventual bench trial, the district court ruled for the defendants on both counts 1 and 2. Bogosian v. Woloohojian, 167 F. Supp. 2d 491 (D.R.I. 2001). Among its findings of fact, the court determined that (i) the defendants had owed Bogosian a fiduciary duty, in her capacity as a minority shareholder; (ii) their removal of Bogosian as the WRC president in 1986 had not breached their fiduciary duty to her, in that no WRC shareholder had any reasonable expectation of indefinite employment, particularly after having elected to cease performing any further work for the company while continuing to receive full salary; (iii) Bogosian had adduced no evidence that the defendants impeded her in any way from performing her company responsibilities after 1986; and (iv) James and Harry had not acted in bad faith when they initiated the Fall River litigation against Bogosian.

<u>Id.</u> at 498-502.

Bogosian now appeals from the final district court judgment in relation to all three counts.  The defendants cross-appeal from the district court ruling relating to the third count.

**II**

**<u>DISCUSSION</u>**

**A.    <u>The Bogosian Appeal</u>**

**1.    <u>The Right to Jury Trial</u>**

Bogosian insists that the district court contravened the Seventh Amendment by failing to accord her a jury trial on counts 1 and 2.  <u>See</u> Fed. R. Civ. P. 38; <u>see</u> <u>also</u> Fed. R. Civ. P. 39(b) ("Issues not demanded for trial by jury as provided in Rule 38 shall be tried by the court.").   We conclude that the district court did not err.[4]

First, although Bogosian acknowledges that no jury-trial demand was made in the amended complaint as to counts 1 and 2, and that the defendants made no such demand in their answer, Bogosian's reply to their answer did demand a jury trial on defendants' <u>counterclaim</u>.  The counterclaim alleged that Bogosian had converted WRC funds to her personal use.  Bogosian contends that the issues at the heart of both her claims, as well as the counterclaim, were

---

[4]We note that Bogosian has simply assumed that she is entitled to a jury trial under § 7-1.1-90, notwithstanding that a claim of "breach of fiduciary duty" has long been recognized as an equitable cause of action, to which no right to jury trial attaches.  <u>See</u> <u>In re Evangelist</u>, 760 F.2d 27, 29 (1st Cir. 1985).

-10-

so "interwoven" that the latter demand implicitly preserved her right to jury trial on all three matters, even though the defendants ultimately dismissed their counterclaim prior to trial.

The lone case citation submitted for the present contention is wholly inapposite. Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494 (1931), involved the entirely distinct matter as to whether, upon remand for a new trial, the issues of liability and damages fairly may be addressed in separate trials. The Supreme Court simply observed that issues of liability and damages frequently are "interwoven." Id. at 500-01. Thus, Champlin neither implicated the right to jury trial, nor in any sense remotely suggested that the right to jury trial, once affirmatively waived, must be restored due simply to the fact that the opposing party in the litigation happens to have alleged a so-called "interwoven" counterclaim.

The Bogosian complaint and the appellees' counterclaim were not "interwoven," however, at least as concerns the right to jury trial. In counts 1 and 2 of the amended complaint, Bogosian alleged that appellees had breached their fiduciary duty to her as a minority shareholder, by, inter alia, initiating the vexatious Fall River litigation in which the appellees alleged that she had breached her fiduciary duty to WRC by usurping a corporate opportunity. Bogosian incorrectly asserts on appeal that appellees' counterclaim "complained that [she] breached her

-11-

fiduciary duty [to WRC] when she purchased options on the property in Fall River." (Emphasis added.)  Instead, in their counterclaim the appellees merely alleged that Bogosian had utilized her official position in WRC to retain legal counsel to handle her own — as distinguished from corporate — legal matters, including the Fall River litigation.

Federal Rule of Civil Procedure 38(b) permits a party to "demand a trial by jury of any issue triable of right by a jury," provided the jury-trial demand is served within ten days "after the service of the last pleading directed to such issue."  Fed. R. Civ. P. 38(b).  Bogosian contends, in effect, that she was entitled to a jury trial on counts 1 and 2 simply on the basis that her complaint and appellants' counterclaim arose from a common factual setting, viz., the Fall River property litigation.  The right to jury trial depends not upon the factual setting from which the claim arose, however, but (i) upon whether the claim involves an issue "triable of right by a jury," and (ii) upon the nature of the cause of action as well as its historical treatment in English-American jurisprudence (viz., whether the proceedings are more emblematic of a "legal" proceeding, as distinguished from an "equitable" one).  See Tull v. United States, 481 U.S. 412, 417-18 (1987); see also supra note 3.

Additionally, we are not presently confronted with the situation in which two claims require factfinding on an element

-12-

common to both causes of action, such that the nonequitable claim might need to be tried first to a jury.  Cf., e.g., Allison v. Citgo Petrolem Corp., 151 F.3d 402, 423-24 (5th Cir. 1998); Cabinet Vision v. Cabinetware, 129 F.3d 595, 599-600 (Fed. Cir. 1997).  Had these appellees initially tried their counterclaim before a jury, the lone pertinent factual element would have been whether the Fall River litigation related to Bogosian's personal business, such that she would have been in breach of her fiduciary duty to WRC by having converted its funds for the purposes of retaining counsel to handle her own case.  In contrast, Bogosian could prevail on her equitable claims in counts 1 and 2 only by demonstrating that the appellees had acted in bad faith by initiating the litigation relating to the Fall River property — a finding neither essential to, nor an element of, their counterclaim for conversion.

Next, Bogosian asserts that she relied upon an inaccurate docket entry by the clerk's office, which mistakenly stated: "Defendant made a demand for a jury."  Yet Bogosian neither provides a citation to the record on appeal, nor can we glean any such docket entry from the record on appeal, see Fed. R. App. P. 28 (requiring that appellant cite to record as to each salient fact).  Moreover, not only was she a "defendant" as to appellees' counterclaim, but even if any such docket entry did advert to the appellees in the singular (i.e., "Defendant"), Bogosian cites no authority for the suggestion that reliance on an obvious clerical

-13-

error suffices to resurrect a right to jury trial previously waived.

Lastly, Bogosian maintains that she opposed the district court ruling rejecting her motion to continue by asserting that the scheduling of counts 1 & 2 for bench trial abrogated her Seventh Amendment right to jury trial. The present contention is patently flawed in at least two respects: (i) her cursory objection failed to detail the nature of any putative error; and (ii) without more, no such belated objection can serve to resurrect a jury-trial right long since waived. See Fed. R. Civ. P. 38(d) ("The failure of a party to serve and file a demand as required by this rule constitutes a waiver by the party of trial by jury.") (emphasis added); Fed. R. Civ. P. 39(b) (noting that party who fails to make timely request for jury trial may avoid waiver and secure a jury trial only if the district court, in its discretion, acts favorably on such a request).

Accordingly, we affirm the district court ruling that Bogosian waived any right to trial by jury in relation to counts 1 & 2.

2.    **The Motions for Continuance
      Relating to Counts 1 and 2**

Next, Bogosian maintains that the district court erred in denying her motions to postpone the bench trial due to her life-threatening illness. We review trial-management rulings for clear abuse of discretion and "[o]nly an 'unreasoning and arbitrary

-14-

insistence upon expeditiousness in the face of a justifiable request for delay will abuse [such discretion].'" <u>N.E. Drilling, Inc.</u> v. <u>Inner Space Servs., Inc.</u>, 243 F.3d 25, 36 (1st Cir. 2001) (citation omitted).  Our review examines, <u>inter</u> <u>alia</u>, the delay entailed, the reasons for the request, whether the moving party is at fault, any inconvenience to the court and litigants, and whether the denial of a continuance unfairly would prejudice the moving party.  See <u>FDIC</u> v. <u>Houde</u>, 90 F.3d 600, 608 (1st Cir. 1996).

Although we recognize that Bogosian experiences serious health problems, the record on appeal plainly reflects that these district court rulings were neither irrational nor arbitrary.  First and foremost, by July 2000 when Bogosian submitted the initial motion to continue the trial, this litigation had been languishing for twelve years.  Her motions were also predicated upon her recent retention of new counsel, the ninth such substitution of counsel since she initiated her lawsuit.  Even assuming some adequate justification for Bogosian's numerous replacements of trial counsel, the attendant further delays plainly afforded additional legitimate grounds for the district court to continue to seek, wherever practicable, a fair and expeditious disposition of the case.  See <u>Amarin Plastics, Inc.</u> v. <u>Md. Cup Corp.</u>, 946 F.2d 147, 151 (1st Cir. 1991) (noting that trial court may consider reasons for previous delays).

Second, medical doctors determined that Bogosian, then

age 77, suffered from several debilitating illnesses, including severe arthritis and a serious anxiety disorder. See Morrissey v. Nat'l Mar. Union, 397 F. Supp. 659, 668 (S.D.N.Y. 1975) (noting unavailable witness's advanced age as ground for denying continuance), aff'd, 544 F.2d 19, 32 (2d Cir. 1976). As regards her metastatic lung cancer, Bogosian's doctors performed major surgery (viz., a lobectomy), followed by an "arduous" course of concurrent radiation and chemotherapy, which was expected to provide Bogosian with but a 30% to 50% prospect of long-term survival. Although in more normal circumstances a continuance may well have been warranted, there existed the very real prospect that any immediate postponement almost surely would deteriorate into an indefinite one given that Bogosian's physical condition was such as reasonably to suggest that it was improbable that she would ever become more available to assist counsel or testify at trial. See Amarin Plastics, Inc., 946 F.2d at 152-53 (noting absence of any reasonable indication that party would ever improve enough to appear at trial); Scholl v. Felmont Oil Corp., 327 F.2d 697, 700 (6th Cir. 1964) (affirming denial of continuance absent any medical assurances that witness would ever be available to testify at trial).

Third, trial counsel for Bogosian advised the district court at the September 2000 hearing that he intended to substitute a "limited liability" family corporation as the lone plaintiff, in

-16-

order to minimize Bogosian's continued involvement and participation in the proceedings. Plainly, such a representation by counsel strongly implied that other members of Bogosian's family were available and competent to assist counsel with further pretrial preparations.

Fourth, Bogosian's protestations on appeal notwithstanding, the district court granted her July 2000 motion to continue, thereby authorizing the requested 190-day extension, whereupon the anticipated trial date was postponed to late March 2001. Moreover, the district court subsequently allowed yet another motion for continuance, further postponing the trial to May 8, 2001.

Fifth, Bogosian submitted no updated medical documentation that she remained unfit to testify at trial in May 2001, even though her oncologist had represented in a November 3, 2000, letter that her treatment would "finish in late January [2001]," and that he anticipated "a month or so of post-treatment recovery."[5] Moreover, in a January 2001 follow-up letter, the oncologist reiterated that his estimate of the "anticipated recovery time for Ms. Bogosian from all her treatment would not be until the end of February of this year 2001." The January 2001 letter was the final pretrial communication from her medical

---

[5]The only medical evidence Bogosian presented consisted of letters from her doctor to her lawyer. She adduced no medical records or affidavits whatsoever.

professionals regarding when she would be able to testify at trial.[6]  As the district court observed at trial, Bogosian "still has not shown she is incapable of testifying in open court.  All I have is [counsel's] word that she is not able to come to court.  I see no doctor's certificate."

Moreover, the district court later allowed Bogosian's deposition testimony to be admitted at trial.  Finally, Bogosian has made no contention on appeal (let alone any showing) that her deposition testimony was inherently inferior, in any respect, to her anticipated live testimony.  See Wells v. Rushing, 755 F.2d 376, 380 (5th Cir. 1985) (noting that need for continuance becomes less compelling where testimony comes in by deposition).

Accordingly, given the totality of the circumstances, the district court rulings regarding Bogosian's requests for a sick-leave-based continuance did not remotely constitute an "'unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'"  N.E. Drilling, Inc., 243 F.3d at 36 (citation omitted).[7]

---

[6]At trial, Bogosian's counsel asserted that she remained unavailable to testify, noting that the January 2001 letter stated that she would "need several more months from the time of this writing to recover."  The doctor did not define the phrase "several months," however, and in the remainder of the letter he repeatedly specified that he expected her to "recover[] from the side effects of treatment [by] . . . late February of [sic] March of this year."

[7]Additionally, Bogosian faults a district court ruling made in 2000, denying her further discovery requests relating to counts 1 and 2.  She argued then that events beyond her control (viz., her

### 3.    **The Motion for Continuance Relating to Count 3**

In March 1998, Bogosian discovered a discarded CD-ROM containing hundreds of internal WRC documents.  One year later, as directed on remand, see Bogosian, 158 F.3d at 9, the district court scheduled an evidentiary hearing to determine Bogosian's one-third portion of the tax liability which WRC incurred upon the sale of certain corporate properties in order to generate the funds with which to acquire her WRC shares, pursuant to WRC's count 3 statutory election.

The day before the scheduled hearing, Bogosian submitted a motion to continue, citing a further need to extract and evaluate the newly-discovered CD-ROM documents.  She contended that at least one of the extracted CD-ROM documents suggested that (i) WRC had committed fraud on the court at the pre-remand hearing regarding count 3, during which the district court placed a valuation on the WRC assets and cash flow; (ii) a portion of the sales proceeds from one piece of property was diverted covertly by WRC to other corporate purposes; and (iii) WRC overstated, by one hundred percent, the capital gains it realized from the sale.

---

illness and her former counsel's withdrawal) thwarted her discovery efforts.  We review trial-court discovery rulings only for abuse of discretion.  See Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 244 F.3d 189, 191-92 (1st Cir. 2001).  We discern nothing approaching such abuse here.  Appellant has been accorded ample opportunity to conduct discovery on these counts ever since 1989.  Moreover, to the extent she now relies upon the contention that her former counsel were derelict in pursuing discovery, her recourse, if any, obviously lies elsewhere.

Bogosian now maintains that (i) the district court allowed insufficient time for her to retrieve the documents relating to certain suspicious business practices, vaguely described by her counsel as the marking-up of WRC's payroll and the mishandling of insurance proceeds, and (ii) these documents reflected that WRC had initiated these activities prior to February 1989 (viz., the date Bogosian was terminated), thus tending to suggest that her brothers had a motive for freezing her out of WRC (viz., in order to conceal their own misfeasance from her). We discern no abuse of discretion in these rulings. See N.E. Drilling, Inc., 243 F.3d at 35.

At the March 30 hearing, Bogosian sought a three-week delay to study the contents of the CD-ROM. Over defendants' objection, the district court allowed as how the proffered evidence appeared to be relevant to the disposition of count 3, then granted the continuance. Furthermore, when the district court proposed to suspend the accrual of interest on the count 3 fund, Bogosian's counsel expressed ready agreement.

Thereafter, at a hearing held on April 28, Bogosian's counsel requested yet another thirty-day continuance within which to depose WRC's controller concerning the previously-discussed land sale, stating emphatically: "After 30 days is up, that's it, we are ready for trial," and "[a]ll I am asking for is 30 days, and to get on with this trial."

On the ample basis of these representations, the district court granted the requested continuance for the limited purpose of deposing the WRC controller.

At a hearing on July 30, however, Bogosian requested yet another round of discovery — even though she had yet to depose the WRC controller — contending that (i) the CD-ROM documents had demonstrated that the WRC had a much larger monthly cash flow in 1996 than the $9,500 previously represented to the court, (ii) "we . . . can envision a situation . . . where WRC was being used as a private cookie jar" [i.e., improperly and surreptiously to syphon off cash to its shareholders], (iii) WRC's so-called compulsion to sell its assets in order to buy out her shares probably was a ruse, and (iv) accordingly, Bogosian should not be held accountable for her one-third share of the tax liability associated with the sale of those shares.

The choice of the term "envision" by Bogosian's counsel was telling indeed. Pressed by the court, counsel admitted that he had no "basis for claiming [that WRC did not have to sell the properties]," but that additional discovery might disclose cash diversions by insiders. Then and there, the district court made clear that it would not permit additional discovery, unless "there's really newly discovered evidence here," and that Bogosian had submitted no motion for new trial "showing [any] newly discovered evidence." Accordingly, the court denied the motion for

-21-

additional discovery, then "seriously" took under advisement appellees' motion for sanctions.

Given the exceptionally sorry travel of this case, the instant contention can only be deemed utterly frivolous. Far from abusing its discretion, the district court proceeded to allow the continuances requested by Bogosian's counsel to study the CD-ROM documents and conduct limited depositions. Thereafter, it reasonably drew the line when Bogosian acknowledged that she had no newly-discovered evidence warranting further discovery. See Ameristar Jet Charter, Inc. v. Signal Composites, 244 F.3d 189, 193 (1st Cir. 2001) (noting that appellant "concedes, however, that it has no evidence that it will receive contradictory testimony. . . [and] [w]e will not allow [it] to go on a 'fishing expedition,' with the mere 'hope' that it will obtain such information") (citation omitted).[8]

---

[8]Bogosian additionally contends that the district court erred in calculating her share of the tax liability WRC incurred in selling its assets to fund the purchase of her shares. She devotes one cursory paragraph to this contention in her appellate brief, and engages in no argumentation on its merits. Instead, she invites our perusal of the record on appeal to divine the substance of the arguments she advanced in the district court. We accordingly deem her argument waived on appeal. See FDIC v. LeBlanc, 85 F.3d 815, 820 (1st Cir. 1996) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, [will be] deemed waived for purposes of appeal.'") (citation omitted).

### 4. The Evidentiary Rulings Relating to Counts 1 & 2

#### a) The Motion to Quash Subpoena Served Upon Opposing Counsel

Next, Bogosian contends that the district court made several erroneous rulings at trial. First, she suggests that her due-process rights were violated when the district court (i) quashed her subpoena against opposing counsel, William Grimm, and (ii) barred Bogosian from submitting a proffer as to the substance of Grimm's anticipated testimony. See Fed. R. Evid. 103(a)(2).

Trial court rulings on motions to quash are reviewed only for abuse of discretion. See Town of Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1456 (1st Cir. 1992). Although not strictly forbidden, the procurement of trial testimony from opposing counsel is generally disfavored. See United States v. Yonkers Bd. of Educ., 946 F.2d 180, 185 (2d Cir. 1991). Among the appropriate factors for consideration by the trial court are the following: whether (i) the subpoena was issued primarily for purposes of harassment, (ii) there are other viable means to obtain the same evidence, and (iii) to what extent the information sought is relevant, nonprivileged, and crucial to the moving party's case. See Pamida, Inc. v. E.S. Originals, Inc., 281 F.3d 726, 729-30 (8th Cir. 2002); Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd., 825 F.2d 676, 680 n.2 (2d Cir. 1987).

At trial, Bogosian maintained (i) that she had two internal WRC documents which would show that Mr. Grimm had been a

WRC director in 1989-90, (ii) that during this same period WRC had engaged in suspicious business practices, vaguely described by her counsel as the marking-up of its payroll and the mishandling of insurance proceeds; (iii) that these marked-up documents demonstrated that WRC initiated these activities prior to February 1989 (viz., the date Bogosian was terminated), thus tending to indicate that her brothers had a motive for freezing her out of the company (viz., in order to conceal their misfeasance from her). We discern no abuse of discretion whatsoever by the district court.

As evidence of her apparent intent to harass the defense, we note that Bogosian (i) served the subpoena the day before trial, without the slightest attempt to explain why she had failed to depose opposing counsel during the preceding ten-year period of ongoing discovery, (ii) requested that Mr. Grimm produce eighteen broadly-described categories of corporate documents spanning more than two decades (i.e., since 1980), (iii) made no showing that she was unable to obtain the evidence from other sources, particularly WRC, their rightful owner, (iv) requested that Mr. Grimm testify at trial solely to the "existence[] or ... authenticity" of the two documents, testimony she obviously could have obtained from any number of witnesses other than Mr. Grimm, (v) sought testimony from Mr. Grimm which was marginally relevant at most, in that the two documents postdated the "freeze-out." Finally, the testimony sought from Mr. Grimm — in all likelihood and for the most part —

would have been cumulative, since Bogosian herself adduced other evidence that her brothers had "frozen her out" in order to conceal from her their alleged corporate shenanigans.

Accordingly and for the foregoing reasons, the district court ruling quashing the subpoena must be affirmed.

### b) The Adverse Inference Sought Based On the Failure of Certain Defendants to Appear at Trial

Bogosian next contends that the district court erred in declining to infer — from the failure of defendants James and Z. Elaine Woloohojian to appear at trial — that their testimony would have been adverse to the defense. She points to the putative testimony of her process server that these defendants made themselves unavailable to testify by evading service of process.[9] We discern no error.

The "missing witness" rule permits, rather than compels, the factfinder to draw an adverse inference from the absence of a witness, see Niziolek v. Ashe, 694 F.2d 282, 292 (1st Cir. 1982), particularly where the factfinder concludes that the party who requested the adverse inference failed to subpoena a witness otherwise available to testify, see Trump Plaza Assocs. v.

---

[9]Bogosian also argues that the district court violated her due-process rights in precluding her Rule 103(a)(2) proffer that key witnesses (e.g., her sister-in-law, Z. Elaine Woloohojian), whom she subpoenaed to appear at trial, deliberately had evaded her process server. The record discloses, however, that her counsel, earlier in the trial, stated that he had made this very proffer. See Trial Tr. (5/8/01), at 11.

-25-

Poskanzer (In re Poskanzer), 143 B.R. 991, 998 (Bankr. D.N.J. 1992). As the finder of fact, of course, it was for the district court to determine the credibility of the proffer Bogosian made regarding the process server's testimony.

In so doing, the district court simply concluded that James and Z. Elaine Woloohojian had not evaded service of process. As such credibility determinations are within the unique province of the trier of fact, see Carr v. PMS Fishing Corp., 191 F.3d 1, 7 (1st Cir. 1999), the district court was not compelled to draw the suggested adverse inference from the absence of James and Z. Elaine Woloohojian at trial.[10]

## 5. The Factfinding in Relation to Counts 1 & 2

Finally, Bogosian insists that the district court, in finding for the appellees on counts 1 and 2, committed various errors of law and ignored unrebutted evidence favorable to her case. Following a bench trial, the district court's findings of fact, including its witness-credibility assessments, are reviewed for clear error only. See Barrs v. Lockheed Martin Corp., 287 F.3d 202, 210 (1st Cir. 2002); Carr, 191 F.3d at 7. The outcome in the

---

[10]Further, it may well be that any such adverse inference, in itself, would have been considered marginally probative, given the fact that James and Z. Elaine Woloohojian were not "missing witnesses" at all, since their depositions were admitted at trial. See Cameo Convalescent Ctr., Inc. v. Senn, 738 F.2d 836, 844 (7th Cir. 1984) (noting that any such adverse inference becomes less compelling where testimony of witness is admitted at trial by way of deposition).

instant case turned principally upon just such credibility determinations.

The district court explicitly credited appellees' testimony that Bogosian was fired solely because she voluntarily ceased performing any work at WRC, while continuing to draw full salary and benefits. Bogosian, 167 F. Supp. 2d at 503 ("This court credits the testimony of James and Harry."). Undaunted, Bogosian incorrectly asserts on appeal that her late brother, Harry, provided unrebutted deposition testimony that the actual basis for her termination had been that she sought to audit the corporate books. Instead, Harry simply attested to the fact that Bogosian had requested the audit and questioned the defendants' motives. Harry did not state, however, that this was what prompted Bogosian's discharge.

Thus, the mere description of Bogosian's requests certainly did not compel the district court to determine, as a fact, either that her audit requests were justified or that she was fired by her brothers in order to prevent her revelation of their improper business practices. Indeed, Bogosian has never adduced any corroborative evidence whatsoever in regard to her allegations.

Instead, Bogosian simply maintains that she adduced evidence that Harry was not terminated by WRC in the early 1980's for failure to perform his corporate duties, and that WRC's disparate treatment of her belies appellees' purportedly legitimate

-27-

basis for terminating her. The district court reasonably determined, however, that Bogosian was well aware — regardless whether Harry should have been fired earlier — that she was knowingly inviting termination by her refusal to perform her own corporate responsibilities. Thus, although a rational factfinder conceivably may have inferred some such nefarious motive as that suggested by Bogosian based on the proffer of disparate-treatment evidence, the record plainly did not compel any such inference.

Further, Bogosian contends that her daughter presented unrebutted testimony that appellees advised her that it would be futile for Bogosian to come to work, since they intended to ignore her input on corporate decisionmaking. However, it remains within the exclusive province of the trier of fact to determine whether unrebutted testimony is creditworthy. See Carr, 191 F.3d at 7. Thus, the district court explicitly found (i) that Bogosian's daughter had her "own agenda" and (ii) that she had demonstrated on the witness stand that she lacked credibility. Bogosian, 167 F. Supp. 2d at 500.

Next, with regard to whether appellees' commencement of the Fall River litigation constituted a discrete breach of their fiduciary responsibilities, Bogosian urges us to set aside the district court finding that appellees commenced their action in the "good faith" belief that Bogosian had misappropriated a corporate opportunity of WRC by purchasing the Fall River property on behalf

of E & J.  Id. at 500-01.  She contends that the state court found not only that she had not breached her fiduciary duty, either to WRC or her brothers, but that appellees' lawsuit had been "unfounded" (viz., frivolous, designed solely to harass and to recover damages to offset their anticipated buy-out of her shares).

Quite the contrary, the state court simply turned away appellees' alternative contentions on appeal, either (i) that they had adduced such compelling evidence of Bogosian's breach of her fiduciary responsibility that a reasonable factfinder was compelled to find in their favor, or (ii) that the judgment was against the clear weight of the evidence.  In its unpublished opinion, made part of the record before us, the state appellate court explicitly noted that appellees had adduced evidence which might have been credited by the jury, but that the jury chose instead to credit Bogosian's version.  Cf., e.g., Bartlett v. John Hancock Mut. Life Ins. Co., 538 A.2d 997, 1000 (R.I. 1988) (noting that "bad faith" will not be inferred where party sued on debatable issue of law). The Bogosian appeal itself, ironically, has now been hoisted on the same petard.

Bogosian further faults the district court for (i) finding that she sustained no damages as a result of the Fall River lawsuit, and (ii) ignoring that the appellees had lodged a lis pendens against the Fall River property, that three prospective buyers thereafter decided not to purchase the property, and that

state law permits the factfinder to infer that such a cloud on title thwarted its sale. See Anthony A. DeLeo v. Nunes, Inc., 546 A.2d 1344, 1347-48 (R.I. 1988). As her citation to DeLeo itself acknowledges, however, any such inference is permissive, rather than mandatory. Id. ("Filing such a document without a colorable claim is done at the filer's peril."). Moreover, appellees adduced ample evidence that the three prospective purchasers of the Fall River property backed out for reasons other than the lis pendens. Bogosian, 167 F. Supp. 2d at 496-97.

Bogosian points also to her brother James's testimony that he has never believed that she stole a WRC corporate opportunity by purchasing the Fall River property through E & J. She insists that James's testimony compelled a finding that the property did not represent a corporate opportunity of WRC, and, consequently, that she could not have pirated such an opportunity from WRC.

The present contention conveniently ignores the requirement that the proffered testimony is to be viewed in the context of the witness's other testimony: (i) that James, unlike Bogosian, had not participated in the initial decision to acquire the property for E & J, rather than for WRC, and (ii) that James believed from the outset that Bogosian's decision violated her fiduciary duty to WRC and to their brother, Harry, who was not a partner in E & J. Additionally, the district court aptly cited

-30-

James's testimony that the Fall River property acquisition was unlike E & J's other purchases, in that WRC itself had remitted the option fees to obtain the former. Bogosian, 167 F. Supp. 2d at 502.

As the record on appeal contains ample supportive evidence for the district court judgment relating to counts 1 and 2, there was no clear error. See Barrs, 287 F.3d at 206.[11]

B.    **The Cross Appeal**

The defendants cross-appeal from the district-court award of prejudgment interest to Bogosian under count 3, contending that it erroneously applied a 12% prejudgment interest rate. See Bogosian, 93 F. Supp. 2d at 157-59. In 1997, the district court (Boyle, S.D.J.) calculated the value of Bogosian's corporate shares

---

[11]Bogosian also asserts that the district court erred in denying her postjudgment request that the funds in the court registry be disbursed to her forthwith. She characterizes the denial as a de facto stay which should have necessitated that defendants post a supersedeas bond as security for their judgment debt. We do not agree. First, a bond is required only where the plaintiff is unsecured or undersecured due to the fact that the entire judgment has not yet been satisfied. Whereas WRC has already overpaid its judgment debt into the court registry, and is due a refund on remand. See, e.g., Corrigan Dispatch Co. v. Casa Guzman, S.A., 569 F.2d 300, 302-03 (5th Cir. 1978) (noting that district court may dispense with security-bond requirement where entire purchase price in disputed sale has been paid into court registry). Second, the district court aptly noted that the precise amount of the disbursement due Bogosian from the court registry has yet to be finally determined, in light of the current WRC cross-appeal from the interest award, see infra Section II.B, and the pendency of the 1993 interpleader action by Bogosian's creditors, who claim entitlement to an as-yet undetermined portion of her count 3 award.

-31-

in WRC, holding that she was not liable for any of the taxes WRC incurred in selling its assets to generate the monies with which to fund the buy-out. Bogosian, 973 F. Supp. at 106-07. The "minority shareholder oppression" statute in effect at the time simply prescribed that the "petitioner shall be entitled to interest on the purchase price of the shares from the date of the filing of the [defendant's] election to purchase the shares." R.I. Gen. Laws 7-1.1-90.1 (1998) (emphasis added). As the statute specified neither the rate of interest nor the method for calculating it, the district court conducted an evidentiary hearing at which expert testimony was adduced as to a fair rate of return, viz., the interest Bogosian would have been able to earn had she received and prudently invested the purchase monies in 1989. After entertaining estimates ranging from 8 to 15%, the district court settled upon 11%, compounded monthly, as a reasonable rate. Bogosian, 973 F. Supp. at 107-09.

WRC appealed, contending that (i) § 7-1.1-90.1 (1998) did not contemplate the compounding of interest, and (ii) the choice of the 11% rate overstated Bogosian's actual lost-investment income. Thereafter, we upheld the 11% calculation, but found that § 7-1.1-90.1 prescribed simple interest only, rather than compound interest. Bogosian, 158 F.3d at 9. Moreover, we reversed the district court determination that the cross-appellee need not be held responsible for one third of WRC's tax liabilities, then

remanded for further factfinding on the latter issue. Id. at 6-7.

On remand, the district court took tax liabilities into account and determined that Bogosian was due roughly $4,000,000 from defendants in recompense for her corporate shares. Bogosian, 93 F. Supp. 2d at 154. Turning to the interest award, the district court noted that § 7-1.1-90.1 had been amended in July 1999 to read: "The petitioner is entitled to interest, at the rate on judgments in civil actions, on the purchase price of the shares from the date of the filing of the election to purchase the shares." R.I. Gen. Laws § 7-1.1-90.1 (1999) (emphasis added). As the Rhode Island statute prescribes a 12% prejudgment interest rate in civil cases, see R.I. Gen. Laws § 9-21-10 (1997), and the version of § 9-21-10 in effect at the entry of judgment controlled the interest rate, the district court boosted the interest award against defendants to 12% simple interest, Bogosian, 93 F. Supp. 2d at 155-56, for a total interest award on count 3 approximating $3.8 million, id. at 158. In October 2001, following a bench trial on counts 1 and 2, the district court entered final judgment on the Bogosian complaint, which incorporated its April 2000 decision awarding prejudgment interest.

On appeal from the final judgment the defendants assert two challenges to the 12% interest award. First, defendants contend that the amended version of § 7-1.1-90.1, with its addition of the phrase "at the rate on judgments in civil actions,"

unambiguously expresses a legislative intendment to import the postjudgment interest rate, rather than the prejudgment interest rate. Their contention is predicated on the fact that, under Rhode Island law, the term "judgment" refers to the final judgment.

We review interpretations of state statutes de novo. See Manchester Sch. Dist. v. Crisman, 305 F.3d 1, 9 (1st Cir. 2002). Absent state-court case law on point, wherever practicable we undertake a fair prediction as to the course the highest state court would take were it presented with the same legal issue. See Nieves v. Univ. of P.R., 7 F.3d 270, 274-75 (1st Cir. 1993).

We are unable to discern how the mere fact that the term "judgment" denotes "final judgment" aids in the interpretation of the pivotal phrase "on judgments." That is to say, it is by no means clear that prejudgment interest is any less a form of interest "on" a final judgment than is postjudgment interest. Under section 7-1.1-90.1, interest on the purchase price of corporate shares is explicitly required to be measured "from the date of the filing of the election to purchase the shares," and, presumably, continues until the entry of final judgment, at which time the stock purchase is deemed to have occurred. Consequently, the legislature reasonably may have anticipated that prejudgment interest would be considered interest "on" — viz., measured in reference to, then added "on" to — a [final] judgment.

Common sense suggests that since the pre-amendment

-34-

version of § 7-1.1-90.1 was somewhat ambiguous as regards the precise means to be used to calculate "interest," the legislative amendment simply sought to clarify the matter by explicitly tying the § 7-1.1-90.1 interest rate to the interest rate specified in § 9-21-10.  See, e.g., Liquilux Gas Corp. v. Martin Gas Sales, 979 F.2d 887, 890 (1st Cir. 1992) ("Rather, we hold that the amendment was not a change at all, but a clarification that did not alter the law, and merely explicated it.  Clarification, effective ab initio, is a well recognized principle.  Determination of whether new legislative action is alteration, or merely clarification, may depend on a number of factors.  One may be the fit in language.  A significant one is the fact that the new enactment clarifies an ambiguity.").  Moreover, the plausibility of the postulated interpretation may be readily demonstrated simply by comparing the relative ease with which the district court determined the interest rate in arriving at its post-remand decision in 2000, with the exhaustive factfinding it had been required to undertake in its pre-remand decision in 1998.  Compare Bogosian, 93 F. Supp. 2d at 155-56, with Bogosian, 973 F. Supp. at 107-12.

The defendants argue, in the alternative, that the pre-amendment version of § 7-1.1-90.1 should apply because (i) most of their payments into the court registry were made prior to the legislative amendment, (ii) the accrual of interest on the registry funds was stayed by the district court prior to the amendment, and

-35-

(iii) this court previously had affirmed the "final" determination of the 11% award in <u>Bogosian</u> v. <u>Woloohojian Realty Corp</u>., 158 F.3d 1, 9 (1st Cir. 2000).

First, we note that the defendants did not raise their alternative argument prior to the entry of the final judgment in October 2001, electing instead to submit a postjudgment motion to alter and amend the judgment. As the district court noted in its earlier interlocutory decision relating to count 3 in April 2000, "[b]oth parties agree[d] that the amended statute applies in the case at bar." <u>Bogosian</u>, 93 F. Supp. 2d at 155 (quoting <u>Zawatsky</u> v. <u>Cohen</u>, 463 A.2d 210, 213 (R.I. 1983) ("[T]he interest on a judgment is determined in accordance with the statute in effect at the time of its rendition rather than at the time the action accrued.")). "[A] motion under Rule 59(e) [to alter and amend a judgment] is not appropriately used to present new issues or evidence: 'Rule 59(e) motions are aimed at <u>re</u>consideration, not initial consideration. Thus, parties should not use them to raise arguments which could, and should, have been made before judgment issued. Motions under Rule 59(e) must either clearly establish a manifest error of law or must present newly discovered evidence. They may not be used to argue a new legal theory.'" <u>Jorge Rivera Sirillo & Co.</u> v. <u>Falconer Glass Indus., Inc.</u>, 37 F.3d 25, 29 (1st Cir. 1994) (citation omitted) (emphasis added). Given the heightened standard of review, we conclude that the defendants have failed to demonstrate

-36-

a manifest error of law in the 12% interest award.

First, the present circumstances — that, prior to 1999, defendants paid the bulk of the funds into the court registry and the district court halted the accrual of interest — do not give rise to a manifest inequity. "Statutes that award prejudgment interest generally serve the dual purposes of encouraging the early settlement of claims, and compensating plaintiffs for waiting for recompense to which they were legally entitled." Martin v. Lumbermen's Mut. Cas. Co., 559 A.2d 1028, 1031 (R.I. 1989). On two separate occasions, the district court explicitly found that Bogosian was not responsible for the delay in calculating the value of her shares under count 3. See, e.g., Bogosian, 93 F. Supp. 2d at 155 (noting that "[t]he issues involved in valuating [WRC] have been complex"). Consequently, we discern no equitable basis for denying Bogosian the benefit of the fortuity that § 7-1.1-90.1 was amended before the "final," albeit partial, judgment on count 3 was entered in April 2000.

The decision entered by the district court in 1999, suspending the accrual of interest on the registry funds, is unavailing to the defendants as well. Bogosian agreed to the cessation as a precondition to the allowance, by the district court, of her motions for a continuance of the trial on counts 1 and 2. The defendants thus received considerable protection from

-37-

any delay attributable to those continuances.[12]  Yet the defendants did not request that the district court freeze the rate of interest at 11% as well, which would have provided them additional protection against intervening statutory amendments.  Consequently, although the cross-appellee waived her right to post-1999 accruals of additional interest, she did not waive her right to the "rate-at-time-of-judgment" rule prescribed in Zawatsky v. Cohen, 463 A.2d 210, 213 (R.I. 1983).

Finally, our affirmance of the 11% rate in the earlier appeal, Bogosian v. Woloohojian Realty Corp., 158 F.3d 1 (1st Cir. 2000), is immaterial, as it predated enactment of the amendment to § 7-1.1-90.1.  Based on the pre-amendment statute, the 11% interest calculation was appropriate, in that it was founded on district court factfinding which was not clearly erroneous, and we

_____

[12]Ironically, were it not for the 1999 district court decision to cease interest accruals, the defendants' interpretation of the amended § 7-1.1-90.1 would seem to have required that prejudgment interest be measured up to the entry of the final judgment on counts 1, 2 and 3 in October 2001, rather than up to the entry of the partial "final" judgment on count 3 in April 2000.  As we vacated the interest award on different grounds (viz., compounding of interest), in Bogosian v. Woloohojian Realty Corp., 158 F.3d 1 (1st Cir. 2000), there was no final "judgment" within the meaning of § 7-1.1-90.1. "[T]he term 'judgment' referred to in § 9-21-10 contemplates a final judgment, one that finally adjudicates the rights of the parties, whether it is a judgment from which no appeal is taken or a judgment that is affirmed by this court after consideration and rejection of the appellant's contentions." Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's Inc., 494 A.2d 897, 898 (R.I. 1985).  The attendant irony is reminiscent of the "old saw" that the only thing worse than unanswered prayers are answered ones.

specifically noted, at the time, that § 9-21-10 did not establish the interest rate for § 7-1.1-90.1.  See id. at 8.  Even if we were to construe our prior holding as the law of the case, intervening changes in the substantive law are legitimate grounds upon which to revisit the issue in subsequent proceedings.  See JOM, Inc. v. Adell Plastics, Inc., 193 F.3d 47, 52 (1st Cir. 1999).  Accordingly, we deny the cross appeal and affirm the buy-out price as calculated by the district court under count 3.[13]

**Affirmed. The parties shall bear their own costs**.  **So ordered**.

---

[13]As occurs all too frequently in cases of such magnitude and animosity, appellants presented a plethora of arguments on appeal so utterly lacking in merit as to warrant no mention.  Accordingly, all such arguments are categorically rejected.